RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2018-SC-000542-WC

DATE 9/23/19 JMF

SAMUEL WETHERBY

APPELLANT

ON APPEAL FROM COURT OF APPEALS
V.             CASE NO. 2017-CA-001425-WC
WORKERS' COMPENSATION BOARD NO. 14-WC-68458

AMAZON.COM;                                              APPELLEES
WORKERS' COMPENSATION BOARD; AND
HONORABLE STEPHANIE KINNEY,
ADMINISTRATIVE LAW JUDGE

## OPINION OF THE COURT BY JUSTICE HUGHES

### AFFIRMING

Samuel Wetherby appeals from the Court of Appeals' decision upholding an Administrative Law Judge's (ALJ) award of 6% permanent partial disability benefits to Wetherby because of a work-related injury. Ultimately, Wetherby argues that the ALJ erred by making insufficient findings to exclude a pre-existing condition in assessing his impairment rating. Because our case law governing pre-existing injuries is inapplicable to this case, we disagree. For the reasons stated below, we affirm the Court of Appeals.

### FACTS AND PROCEDURAL HISTORY

Wetherby began working for Amazon.com (Amazon) on June 5, 2012, as a warehouse associate, performing duties such as operating forklifts and

training new employees. On October 3, 2012, Wetherby operated a forklift for most of his shift, then moved 50-60-pound boxes from a pallet onto a conveyor. He stated he was moving a box onto a conveyor when he felt a shooting pain run from his neck down his right arm, then his hand went numb. Although the initial pain subsided, Wetherby continually reported numbness in his right hand. It was ultimately determined that the incident caused a disc herniation in Wetherby's neck, necessitating surgery.

Prior to the work injury, Wetherby sustained a work-related cervical injury and underwent a cervical fusion at the C4-C5 level in 1980. The cervical injury was caused by moving slabs of cement underwater as part of a boat dock construction project. He had another cervical fusion, stemming from the same injury, at C5-C6 in 1985 due to ongoing pain in his left shoulder. However, no medical records were introduced regarding the injury and subsequent fusion surgeries, and the record contains no medical records regarding any medical treatment Wetherby may have received prior to the 2012 work injury. Wetherby testified that he had no pain after the 1985 surgery, and he was "back to normal." He continued working operating heavy equipment and lifting sand bags and wooden boards for approximately four years, before purchasing a convenience store in Georgia.

On January 14, 2013, about three months after the Amazon injury, Wetherby visited Dr. Leung reporting decreased grip strength and numbness in his right hand and forearm. Dr. Leung developed a plan for therapy and medication. Dr. Leung recommended surgical intervention on several follow-up

visits with Wetherby and ultimately referred him to Dr. Owen to discuss possible surgery. Despite his persisting symptoms, during his initial visit with Dr. Owen on March 12, 2013, Wetherby indicated that he would like to avoid surgery if possible.

On July 11, 2013, Dr. G. Christopher Stephens evaluated Wetherby to assess complaints of pain and numbness. Dr. Stephens opined that Wetherby had reached maximum medical improvement, unless he elected to undergo the surgery recommended by Dr. Owen. Wetherby stated that he did not want to pursue additional surgery unless his symptoms worsened. With respect to causation, Dr. Stephens believed the issue was not straightforward, given Wetherby's pre-existing disease of the cervical spine from the prior fusions in 1980 and 1985. However, Wetherby informed Dr. Stephens that he was completely asymptomatic prior to the 2012 work injury. Ultimately, Dr. Stephens rated Wetherby at a 25% impairment immediately preceding the Amazon work injury, and attributed 3% impairment to the work injury, for a total whole person impairment of 28%. Dr. Stephens opined that Wetherby could return to work indefinitely if he refrained from lifting more than 25 pounds without assistance.

Wetherby's symptoms persisted, and Dr. Owen performed right posterior foraminotomies at the C6-C7 and C7-T1 levels on June 9, 2014. The surgery went routinely, but at three months post-operation, Wetherby still reported numbness in his right forearm and fingers. On October 28, 2014, Wetherby again visited Dr. Owen. Dr. Owen opined that Wetherby had reached

maximum medical improvement and recommended he return to work on December 10, 2014. Wetherby continued to work at Amazon after the 2012 work injury up until his 2014 surgery and took six months of leave from work after the surgery. He was still an Amazon employee during discovery related to his workers' compensation claim.

On March 25, 2015, Dr. Frank Burke performed an independent medical evaluation and diagnosed acute cervical spine injury with right radiculopathy, as well as arousal of pre-existing degenerative disc disease.[1] Dr. Burke assessed a 17% whole person impairment rating using the *Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment (Guides)* based on Wetherby's significant radiculopathy. In his deposition, Dr. Burke stated he knew Wetherby had a prior injury, but believed it was not relevant to this case because he was asymptomatic prior to the work injury. Dr. Burke also testified that when he assigned the 17% impairment rating for the work injury, he disregarded the previous injury and residual impairment because the previous injury involved the "upper portion of [Wetherby's] cervical spine" and resulted in left-sided cervical radiculopathy. He stated that Wetherby "has a historical issue, but . . . that's not relevant to this case. It's a different part of the spine . . . different extremity . . . [t]o me . . . it would not affect the rating."

Dr. Burke and Dr. Stephens used different methods of rating Wetherby's impairment. Dr. Stephens used the Range of Motion (ROM) method, and Dr.

---

[1] The ALJ recited this in her opinion although the record does not contain a copy of Dr. Burke's March 25, 2015 report.

4

Burke initially used the Diagnosis Related Estimate (DRE) method. In his deposition, Dr. Burke stated that he considered the ROM method, but since the work injury was to a different part of the spine than the previous injury, he did not think it would be appropriate. Dr. Stephens, on the other hand, criticized Dr. Burke's use of the DRE method.

After receiving criticism about the method of evaluation used in the 2015 assessment, Dr. Burke re-evaluated Wetherby on June 13, 2016, to conduct a ROM assessment and concluded the whole person impairment was 37%, attributing 21% to loss of range of motion. Given that Wetherby's previous injury was to a different part of the spine, Dr. Burke did not attribute any of the impairment rating to the previous injury.

Wetherby was evaluated by Dr. Timothy Kriss on June 8, 2016. He stated that after reviewing the criteria in the *Guides* defining when the ROM method or the DRE method should be utilized, he could not "find a better example of a patient" who met the criteria for using the ROM method. Dr. Kriss opined that the prior injuries and surgeries played a role in Wetherby's current condition. He stated that Wetherby had a 31% whole person impairment, but only attributed 3% to the 2012 work injury and the remaining 28% to the 1980 work injury and subsequent surgeries.

Wetherby initiated a workers' compensation claim on December 4, 2015. The ALJ conducted a hearing on November 1, 2016, and heard Wetherby's live

5

testimony.[2] After considering all the medical evidence, the ALJ determined that Wetherby retained a 25% pre-existing cervical impairment due to his previous injuries, and a 6% impairment stemming from the 2012 work injury for a total whole person impairment of 31%. It appears that the ALJ relied on both Dr. Kriss and Dr. Stephens, adopting Dr. Stephens's impairment rating from the 1980 injury of 25%, and Dr. Kriss's overall impairment rating of 31%, resulting in a 6% impairment attributable to the 2012 work injury.

The ALJ stated that because Dr. Kriss is a neurosurgeon rather than an orthopedic surgeon, he is in an excellent position to assess permanent impairment in this complicated case. The ALJ also noted that Dr. Owen released Wetherby to work in December 2014, justifying the lower impairment rating. The ALJ was not convinced that the work injury aroused Wetherby's prior cervical condition into a symptomatic and disabling reality because the work injury affected a different level of his spine, noting the prior cervical fusions occurred at C4-C6, and the 2012 injury caused disc herniation, necessitating a surgery at C6-C7 and C7-T1.

Wetherby filed a petition for reconsideration, requesting that the ALJ make further findings of fact concerning whether he suffered from a prior active condition. On May 1, 2017, the ALJ reiterated that the work incident caused injury to an "entirely different level of [Wetherby's] cervical spine." Further, the ALJ stated that the medical evidence indicated that Wetherby's

---

[2] The ALJ also considered and referenced in her opinion a deposition of Wetherby taken March 28, 2016.

6

prior cervical fusion at the C4-C6 level is stable and she was not convinced that the 2012 work injury aroused his prior cervical condition. The petition for reconsideration was accordingly denied.

Wetherby appealed to the Workers' Compensation Board (Board) and argued that the ALJ failed to make findings of fact that support the exclusion for a pre-existing active impairment. On August 11, 2017, the Board concluded that the ALJ did not address whether Wetherby had a pre-existing active condition, nor did she state that *Finley v. DBM Technologies,* 217 S.W.3d 261 (Ky. App. 2007), is inapplicable in the case. The Board determined that remand was necessary for the ALJ to address *Finley,* noting that the ALJ may reach the same conclusion and only find a 6% impairment attributable to the work injury.

Before the case was remanded to the ALJ, Amazon appealed to the Court of Appeals and argued that the ALJ's findings sufficiently addressed all contested issues and the decision was supported by substantial evidence. The Court of Appeals agreed with Amazon, holding that the ALJ did not need to apply *Finley* because she found that the 1980 injury was stable and had no disabling effect or connection to the 2012 work injury based on the evidence presented. Further, the Court of Appeals concluded that the ALJ based her opinion on the substantial medical evidence provided by both Dr. Stephens and Dr. Kriss who attributed a 25% and 28% whole person impairment, respectively, to Wetherby subsequent to his 1985 surgery and prior to the 2012 work injury, noting that the ALJ has discretion to choose which evidence she

finds to be most persuasive. *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky. 2000). In a 2-1 decision, the Court of Appeals reversed and remanded to the Board for reinstatement of the ALJ's opinion, award and order.

Wetherby now appeals to this Court, arguing that the ALJ erred in assigning an impairment for Wetherby's pre-existing condition without any evidence that it was an active condition.

## ANALYSIS

In a workers' compensation case, Wetherby, as the claimant, has the burden of proving every element of his claim. *Gibbs v. Premier Scale Co./Ind. Scale Co.*, 50 S.W.3d 754, 763 (Ky. 2001). The ALJ, as fact-finder, has the sole authority to determine the quality, character and substance of the evidence. *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993). On appellate review, the issue is whether substantial evidence of probative value supports the ALJ's findings. *Whittaker v. Rowland*, 998 S.W.2d 479, 481-82 (Ky. 1999). "[T]he ALJ's findings of fact are entitled to considerable deference and will not be set aside unless the evidence compels a contrary finding." *Finley*, 217 S.W.3d at 264.

The sole issue on this appeal is whether the ALJ made sufficient findings in assessing Wetherby's impairment rating, and more particularly, the impact of *Finley* on this case. The gist of one of *Finley*'s primary holdings is often stated as follows:

> To summarize, a pre-existing condition that is both
> asymptomatic and produces no impairment prior to the work-
> related injury constitutes a pre-existing dormant condition.

8

> When a pre-existing dormant condition is aroused into disabling reality by a work-related injury, any impairment or medical expense related solely to the pre-existing condition is compensable.

*Id.* at 265. This portion is identified by the Court of Appeals' panel as a partial summary of the Board's opinion in that case, an opinion which "correctly and succinctly" stated the law regarding compensability for a pre-existing dormant condition. *Id.* In fact, the Board's own discussion, while lengthier, is a clearer statement of the law and underscores how the Court of Appeals' shorthand summary can create issues. The Board in *Finley* stated, as quoted by the Court of Appeals:

> To be characterized as active, an underlying pre-existing condition must be symptomatic *and* impairment ratable pursuant to the AMA *Guidelines* immediately prior to the occurrence of the work-related injury. Moreover, the burden of proving the existence of a pre-existing condition falls upon the employer. *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky.App.1984).

> Alternatively, where the underlying pre-existing disease or condition is shown to have been asymptomatic immediately prior to the work-related traumatic event *and* all of the employee's permanent impairment is medically determined to have arisen after that event—due either to the effects of the trauma directly or secondary to medical treatment necessary to address previously nonexistent symptoms attributable to an underlying condition exacerbated by the event—then as a matter of law the underlying condition must be viewed as previously dormant and aroused into disabling reality by the injury. Under such circumstances, the injured employee must be compensated not just for the immediate physical harm acutely produced by the work-related trauma, but also for all proximate chronic effects corresponding to any contributing pre-existing condition, including any previously dormant problem strictly attributable solely to congenital or natural aging processes, as it relates to the whole of her functional impairment and subsequent disability rating, including medical care that is reasonable and necessary pursuant to KRS 342.020.

9

*Id.* (emphasis in original). Thus, for a dormant condition to produce a compensable claim "all of the employee's permanent impairment [must be] **medically determined** to have arisen after that event," *i.e.*, the current work injury.[3] *Id.* (emphasis added). Against this background, we examine Wetherby's case.

In order for a condition to be deemed pre-existing and active, it must be symptomatic and impairment ratable immediately prior to the work injury. *Finley,* 217 S.W.3d at 265. It was undisputed that Wetherby experienced no symptoms between the 1985 surgery and the 2012 work injury, as supported by the following: (1) Wetherby's report to Dr. Stephens that he was asymptomatic; (2) the absence of any medical records from the period between 1985 and 2012 reflecting that Wetherby sought treatment for any ongoing symptoms or impairment; (3) the lack of any evidence that Wetherby had any problems completing jobs or missed any work due to his condition; and (4) his employment at a variety of jobs, including his Amazon job, without restrictions. Although Wetherby's condition prior to the Amazon injury was impairment ratable (both Dr. Kriss and Dr. Stephens assigned impairment ratings under the AMA *Guides* solely based on the prior injury and surgeries), there is no evidence that his condition was symptomatic. Under *Finley* it was not an active pre-existing condition but it also did not qualify as a dormant condition

---

[3] To be compensable, the dormant condition must be aroused and the claimant has the burden of proving that arousal. *Bennett v. Special Fund,* 919 S.W.2d 225, 227 (Ky. App. 1996).

10

aroused by the 2012 injury because "all of the employee's permanent impairment" could *not* be "medically determined to have arisen after that event," *i.e.*, the 2012 Amazon injury. *Finley*, 217 S.W.3d at 265. Indeed, every physician who examined Wetherby acknowledged some impairment from the earlier 1980 injury and resulting fusions.[4]

The ALJ concluded that Wetherby's 2012 injury was unrelated to his prior injury because it involved a different part of the spine. However, the ALJ cited *Finley* for the definition of an active, pre-existing injury before stating that she was "not convinced Plaintiff's October 3, 2012 work injury aroused his prior cervical condition at a different level in his spine into a symptomatic and disabling reality." This reference to arousal suggests that she considered whether Wetherby's spinal condition was dormant but in fact the ALJ never labeled Wetherby's pre-existing condition as either "active" or "dormant." To reiterate, under the *Finley* definitions it did not fit into either category. Because Wetherby was asymptomatic but he was "medically" ratable as impaired prior to the 2012 injury, he had one characteristic of an "active" condition and one of a "dormant" condition. Ultimately, we agree with the

---

[4] Dr. Stephens assigned a 25% pre-existing impairment, while Dr. Kriss assigned a 28% pre-existing impairment. Dr. Burke did not assign an impairment rating for the 1980 injury until pressed in his deposition. In his deposition Dr. Burke stated that in 1985 Wetherby would have been rated in DRE cervical category IV (25-28% whole person impairment) for the post-operative resolution of his radiculopathy. Dr. Burke would have rated Wetherby "at the lower end of the range" because of the resolution and his return to regular duty work, utilizing his left upper extremity without restrictions.

Court of Appeals that "[t]he ALJ did not need to apply *Finley* in this case because the ALJ found the 1980 injury to be stable and that it had no disabling effect or connection to the October 3, 2012 injury based upon the medical evidence presented."

The lack of connection between the two injuries is underscored by Wetherby's own testimony. In his deposition, Wetherby testified that his prior injury resulted in him being unable to lift his left arm, and the fusion surgeries fixed the problem. For this 2012 injury, the repeated issues that Wetherby reported to doctors were pain and numbness in the right hand, weakness of grip in the right hand, and right-sided neck pain. Even Dr. Burke, Wetherby's expert, testified that during his initial examination of Wetherby he did not consider the prior injury in his impairment rating because the 2012 injury was to a completely different part of the spine.

Wetherby maintains that the ALJ improperly treated him as having an active pre-existing condition, something never proven by Amazon. This misconstrues the evidence and the ALJ's findings. While the ALJ found a 31% whole person impairment and deducted 25% for the prior injury, this was not a "carve out" in the sense of a pre-existing active condition under *Finley*, but rather a requirement of the AMA *Guides* regarding spinal impairment. Kentucky Revised Statute (KRS) 342.730(1)(b) governs the calculation of permanent partial disability benefits and part of the calculation is "the permanent impairment rating caused by the injury or occupational disease as

12

determined by the AMA's "*Guides to the Evaluation of Permanent Impairment*."[5]

The medical opinions of Dr. Kriss and Dr. Stephens, upon which the ALJ relied, were developed after conducting examinations of Wetherby in accordance with the *Guides* as outlined below.

The *Guides* identify two methods used to perform a spinal impairment rating: the diagnosis-related estimate (DRE) method and the range of motion (ROM) method. The DRE method is "the principal methodology used to evaluate an individual who has had a distinct injury. When the cause of the impairment is not easily determined and if the impairment can be well characterized by the DRE method, the evaluator should use the DRE method." *Guides* at 379. Dr. Burke initially used the DRE method to evaluate Wetherby, but later used the ROM method. Although the appropriate method was originally contested in this case, the ALJ stated that all experts eventually agreed that the ROM method is most appropriate because Wetherby underwent surgery for different work injuries at multiple levels.[6]

One of the initial steps in assessing spinal impairment is to select the region involved (*i.e.*, the lumbar, cervical or thoracic spine). *Guides* at 380. Then an examiner must determine the correct method to use. The *Guides* state that the ROM method should be used in several situations, such as when there

---

[5] KRS 342.0011(37) provides that the "*Guides to the Evaluation of Permanent Impairment*" means the fifth edition published by the American Medical Association.

[6] "The proper interpretation of the *Guides* and the proper assessment of an impairment rating are medical questions." *Plumley v. Kroger, Inc.*, 557 S.W.3d 905, 913 (Ky. 2018) (citing *Kentucky River Enterprises, Inc. v. Elkins*, 107 S.W.3d 206 (Ky. 2003).

is radiculopathy at multiple levels in the same spinal region, or when there is multilevel motion segment alteration (such as a multilevel fusion) in the same spinal region. *Id.* at 380. Further, the *Guides'* introduction to the section on spines states "[t]he ROM method is also now used to evaluate individuals with an injury at more than one level in the same spinal region and in certain individuals with recurrent pathology." In Wetherby's case, the ROM method is the most appropriate method of evaluation.[7] Dr. Kriss explained why the ROM method must be used in assessing Wetherby, ultimately concluding that he could not find a better example of a patient justifying the use of the ROM method than Wetherby.

In a later evaluation step, the *Guides* state: "[f]rom historical information and previously compiled medical data, determine if there was a pre-existing impairment . . . ." After determining whether there is a pre-existing impairment, the next step directs an examiner to

> apportion findings to the current or prior condition, following jurisdiction practices and assuming adequate information is available on the prior condition. In some instances, to apportion ratings, the percent impairment due to previous findings can simply be subtracted from the percent based on the current findings. Ideally, use the same method to compare

---

[7] In his medical report, Dr. Kriss referred to the *Guides* and noted four instances when the ROM method should be used:

> (1) If an individual cannot be easily categorized in the DRE class
> (2) When there is multilevel involvement in the same spinal region
> (3) When there is recurrent radiculopathy or recurrent injury in the same spinal region
> (4) When there are multiple episodes producing alteration of motion segment integrity.

In order to justify use of the ROM method, a patient only needs to meet one of the criteria listed and Dr. Kriss opined that Wetherby qualified for the ROM method based on any of the criteria listed above.

14

> the individual's prior and present conditions. If the ROM method has been used previously, it must be used again. If the previous evaluation was based on the DRE method and the individual now is evaluated with the ROM method, and prior ROM measurements do not exist to calculate a ROM impairment rating, the previous DRE percent can be subtracted from the ROM ratings.

*Id.* at 381.

In this case, Dr. Kriss and Dr. Stephens were proponents of the ROM method from the outset of their evaluations. During the hearing before the ALJ, Wetherby stated that he did not visit any doctors between 1985 and the 2012 injury because he was "back to normal" after the 1985 surgery and experienced no pain. Additionally, Wetherby did not file any workers' compensation claims as a result of the 1980 work-related injury, stating that his employer simply paid for the 1980 and 1985 surgical procedures. Therefore, there were no impairment ratings or medical evaluations available. However, based on the history Wetherby orally provided the doctors in his visits, and evaluations of MRIs conducted after the 2012 work injury, and before and after the 2014 surgery, both Dr. Kriss and Dr. Stephens attributed an impairment rating for the 1980 injury.[8] Based on DRE cervical category IV, Dr. Kriss explained that prior to his 2012 injury Wetherby had a whole person impairment of 25% solely based on the loss of motion segment due to a successful or unsuccessful attempt at surgical arthrodesis (surgical immobilization of a joint by fusion). *Guides* at 392. The ALJ properly relied on

---

[8] *See* fn. 4, *infra.* At his deposition, Dr. Burke also acknowledged an impairment rating after the 1980 injury.

15

Dr. Kriss's medical opinion in subtracting the impairment rating attributable to the prior injury because the *Guides* regarding spinal impairment instructed examining physicians to do so. Simply put, Kentucky statutes mandate that impairment be determined in accordance with the *Guides* and the physicians who examined Wetherby did so. Substantial evidence supported the ALJ's findings.

This case is atypical in that the employee's pre-existing medical condition cannot be classified as either active or dormant. Ultimately the condition is unrelated to the current injury but under the AMA *Guides* for assessing spinal impairment it cannot be ignored by an examining physician, *i.e.*, it must be accounted for in determining spinal impairment under the controlling ROM (Range of Motion) method. While *Finley* is controlling law, it cannot contradict the statutorily-mandated AMA *Guides* and, in any event, given that Wetherby's condition does not fit either the active or dormant condition criteria, remand for consideration of *Finley* would serve no purpose.

## CONCLUSION

Because the 2012 work injury resulted in impairment to a different part of Wetherby's spine than the prior injuries, the ALJ did not err in limiting her discussion of *Finley*. Moreover, substantial medical evidence supported the 6% permanent partial disability found by the ALJ. For the foregoing reasons, we affirm the Court of Appeals.

Minton, C.J.; Buckingham, Keller, VanMeter, and Wright, JJ., sitting. All concur. Lambert, J., not sitting.

16

COUNSEL FOR APPELLANT:

Peter J. Naake
PRIDDY, CUTLER, NAAKE & MEADE, PLLC


COUNSEL FOR APPELLEE:

Jo Alice Van Nagell
Brian Wilson Davidson
FOGLE KELLER WALKER, PLLC